UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HOUSE OF PROVIDENCE, et al.,

      Plaintiffs,                         Civil Action No. 19-CV-13424

vs.                                   HON. BERNARD A. FRIEDMAN

BRUCE MEYERS, et al.,

      Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

        This matter is presently before the Court on (1) defendant Ginny Benson's motion to dismiss [docket entry 44], (2) defendant Barbara Blanock's motion to dismiss [docket entry 46], (3) the motion of defendants Bruce Meyers and Kallie Roesner-Meyers to dismiss and to strike [docket entry 50], (4) defendant Larry Roesner's motion to dismiss [docket entry 51], and (5) the motion of defendants Paul Warfield and Kathy Warfield to dismiss and to strike [docket entry 61]. Plaintiffs have responded to each of these motions and defendants have replied. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide these motions without a hearing.

***Background***

        Plaintiffs Jason and Maggie Dunn are the owners and operators of plaintiff House of Providence ("HOP"), "a Michigan licensed Child Care Institution (a 'CCI' or 'foster care home') that houses, cares for, educates and provides mental and emotional therapy for foster care children, serving primarily African American children who are wards of the State of Michigan." Am. Compl. ¶ 7 (footnote omitted). Plaintiffs CD, GD, DD, LD, and MD are the Dunns' adopted African-American children, and plaintiff ST is a disabled African-American

adult for whom the Dunns are the general guardian. *Id.* ¶¶ 12-17.  Plaintiffs allege that in 2016 HOP purchased a 118-acre parcel of land in Oxford Township, Michigan, in an area known locally as "Horse Country" or "Hunt Country," with the purpose of "split[ting] the Property into 4 parcels, building and/or renovating a residential house on each parcel:  one for the Dunns, one for an all-girls foster care home, one for an all-boys foster care home and one for [a] disabled children['s] foster care home."  *Id.* ¶ 49.  The all-girls home, which plaintiffs anticipated opening in January 2018, *id.* ¶ 50, was opened "nearly two years" later,  *id.* ¶ 361, while "[t]he all-boys and disabled children['s] homes are planned for the future."  *Id.* ¶ 49 n.5.

The defendants, Bruce Meyers and Kallie Roesner-Meyers, James and Donna Unis, Cynthia Unis, Barbara Blanock, Ginny Benson, Larry Roesner, and Paul and Kathy Warfield, are Oxford Township residents.  *Id.* ¶¶ 18-25.  Plaintiffs allege that defendants, individually and collectively, have engaged in a campaign to prevent plaintiffs from using their property to construct and operate a CCI because defendants object to the presence of the Dunns' African-American children and HOP's African-American foster children.  Plaintiffs allege:

> 1. Defendants initiated a 3 year long campaign to attack Plaintiffs, an interracial family, and to prevent African American children from residing in and participating in a primarily Caucasian community, known as "Horse Country" or "Hunt Country," by harassing the Plaintiffs (including the minor children), by making false allegations and by bombarding municipal, county and state agencies, with phone calls, emails, petitions and fraudulent complaints.

> *       *       *

> 3. Defendants nefariously interfered with Plaintiffs' ability to obtain a Child Care Institution license, divide its property, build a private roadway, solicit donors, obtain a grant to clean up its property, operate a foster care group home and enjoy their own home.

4. As part of Defendants' coordinated campaign, they made knowingly false child abuse reports to the Department of Health and Human Services in an effort to tear apart Plaintiffs' family, leading to an investigation as to the best interest of the adoptive children of Jason and Maggie Dunn.

5. Defendants, individually and in concert and as members of the "Preservation of Hunt County [sic] Neighbors," used intimidation tactics directed toward the minor children, including but not limited to physically stalking the minor Plaintiff children, referring to the children with racial epithets and slurs, making false child abuse reports and sending Freedom of Information Act ("FOIA") requests to the children's schools and the juvenile/family courts, causing fear for their life, health, safety and for removal from their parents' custody.

6. Defendants also sought to sway the public['s] opinion of the Plaintiffs by making false accusations of diversion of charitable funds and about the Plaintiffs' ministry, values, beliefs and moral character, in furtherance of their conspiracy to interfere with, harass, discriminate and otherwise terrorize the Plaintiffs.

\*   \*   \*

57. From the moment Plaintiffs purchased the Property until the filing of this First Amendment to the Complaint for Damages and Other Relief [Docket 1], the Defendants have harassed, defamed and instilled fear in the Plaintiffs and the Foster Children for the purposes of keeping African Americans out of "Horse County" [sic].

\*   \*   \*

59. The Defendants conspired to conduct a telephone, letter, social media and email campaign against the Plaintiffs and Foster Children by making false reports and complaints on social media, public forums, news outlets and to government entities such as Michigan Department of Environment, Great Lakes, and Energy (formerly known as the Department of Environmental Equality or "DEQ," herein referred to as "EGLE"), Oakland County Equalization ("OCE"), Oxford Township (the "Township"), Oxford Township Planning Commissions ("OTPC"), Oxford Township Zoning Board of Appeals ("ZBA"), Oakland County Health Division ("OCHD"), the Michigan Department for Health

and Human Services ("DHHS"), Michigan Senate and Michigan House of Representatives (collectively the "Legislature"), Michigan Attorney General ("AG") and other state and local government entities.

\* \* \*

61. They also rallied at dozens of Township public meetings and petitioned the OTPC, ZBA and Township Board to keep HOP out of Horse Country because the Plaintiffs do not belong in this quiet, white, agricultural neighborhood, which would be foreign to the black, urban children that reside at the HOP.

\* \* \*

67. Upon information and belief, one or more of the Defendants told Linda Tansil from the Child Welfare Licensing Division for DHHS that "black kids don't belong in Horse Country."

\* \* \*

90. In trying to support their prejudicial rhetoric, Defendants have made fraudulent police reports to the Metamora Police Department, Lapeer County Sheriff Department and Oakland County Sheriff Department, falsely accusing the Children and Foster Children of criminal activity.

91. MD and JD have on numerous occasions had to communication [sic] with law enforcement regarding complaints of someone supposedly seeing one of the Foster Children creating a "nuisance" but each were wholly fabricated. Charges had never been brought and citations have never been issued following these false reports.

92. Defendants have actively invaded the Children's and Foster Children's privacy by sending FIOA [sic] requests to their schools and to the juvenile/family court, seeking confidential records that are not subject to public review under FOIA.

\* \* \*

102. Defendants have made an incalculable number of false reports, complaints and allegations against the Plaintiffs, accusing them of being charlatans by using their faith-based entity for greed

4

and sexual abuse.

\* \* \*

106. [James Unis] claimed that HOP is not really operating as a foster home, but rather as a juvenile prison for the Foster Children and "will ultimately lead to a very high perimeter fence to retain the occupants 24/7," which will decrease the land values.

\* \* \*

113. Defendants also accused the Dunns of embezzling state funds and/or donor funds, intended for use of the foster home, for their own benefit.

\* \* \*

117. Defendant [Cynthia Unis] contends that [Jason and Maggie Dunn] are "committing felonies" by embezzling donor money from HOP, a 26 U.S.C. § 501(c)(3) non-profit entity and that "all the people that listen to them are brainwashed into believing their crap!" (Exhibit 14).

118. In early 2018, Defendants went as far as reporting [Jason and Maggie Dunn] to the AG's office alleging that the Dunns illegally diverted charitable assets for their own personal benefit, failed to report their full income to the IRS and filed false IRS forms.

*Id.* ¶¶ 1, 3-6, 57, 59, 61, 67, 90-92, 102, 106, 113, 117-18 (footnotes omitted).

Defendants allegedly have interfered with plaintiffs' efforts to split their property, *see id.* ¶¶ 127-70; gone to extreme lengths to prevent plaintiffs from operating a CCI on the property, *see id.* ¶¶ 172-87; insisted that state and local agencies strictly enforce environmental rules as to plaintiffs' property, but not as to adjacent property owned by a Caucasian resident, *see id.*¶¶ 189-220; falsely reported to state and local officials that plaintiffs' property is contaminated with toxic waste (lead), *see id.* ¶¶ 227-71; opposed plaintiffs' efforts to obtain a Brownfield Redevelopment Grant to pay for cleaning up the lead waste that defendants contend

contaminates the property, *see id.* ¶¶ 273-97; made false complaints about plaintiffs to the Michigan Department of Health and Human Services, e.g., that plaintiffs' land and water were contaminated, that plaintiffs' use of the property was unlawful, and that child abuse was occurring at HOP, *see id.* ¶¶ 300-20; and urged township officials to amend the master zoning plan to prevent the construction of a facility such as HOP, which one defendant characterized as a "juvenile prison," *see id.* ¶¶ 323-33.

Plaintiffs assert claims against all defendants under 42 U.S.C. §§ 1981, 1982, 1983, 1985(3), based on defendants' alleged race discrimination and interference with plaintiffs' property rights (Counts I-IV); under the Fair Housing Act ("FHA"), 42 U.S.C. § 3167, for defendants' alleged interference with their housing rights (Count V); and under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, for defendants' alleged interference with the disabled plaintiff's right to participate in a foster care program (Count VI). Plaintiffs also assert state-law claims for defamation, intentional and negligent infliction of emotional distress, invasion of privacy, abuse of process, tortious interference with contractual relations, and civil conspiracy (Counts VII-XV). For relief, plaintiffs seek damages, costs, attorney fees, and an injunction.

***Motions to Dismiss***

Seven of the ten defendants have filed motions to dismiss. Under Fed. R. Civ. P. 12(b)(6), the Court may dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible "when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id*. "[A] plaintiff's obligation to provide the 'grounds' of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above a speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The defendants who have filed motions to dismiss seek dismissal on many of the same grounds, and some defendants have adopted other defendants' arguments. Instead of discussing each motion separately, the Court shall examine plaintiffs' claims in order and, as appropriate, discuss the issues defendants raise as to each claim.

### Count I: 42 U.S.C. § 1981

In Count I, plaintiffs allege that defendants violated their rights under 42 U.S.C. § 1981[1] by "interfer[ing] with Plaintiffs['] full and equal benefit of all laws, by making false

---

[1] Section 1981 states:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

allegations to [state and county agencies] for the purposes of keeping the 'Detroit,' 'black,' 'AWOL,' 'urban' and other racial epithets out of Horse Country."   Am. Compl. ¶ 352. Defendants allegedly caused a two-year delay in HOP becoming operational by "making false allegations of 'contamination' and 'toxic waste,' causing unnecessary inspections of the Property and implementation of standards that were more stringent tha[n] the law or EGLE Criteria required." *Id.* ¶¶ 353, 357. Defendants' "false allegations of 'contamination' and 'toxic waste'" allegedly also caused delay in plaintiffs obtaining water and sewer permits and "additional monetary damages for the delay in the construction of the Dunn home and the foster care home." *Id.* ¶¶ 360, 362.   Further, plaintiffs' CCI license was allegedly delayed by defendants' "false allegations of 'contamination,' 'toxic waste,' bribery of DHHS agents and child abuse, causing DHHS investigation of the Property, police investigations of the Dunns, [and] child care interviews with the Children . . . ." *Id.* ¶ 363.  Defendants allegedly also caused construction delay by opposing plaintiffs' applications to split the property and to build a private road. *Id.* ¶ 370.

Cases interpreting § 1981 have held that its focus is on prohibiting racial discrimination in contracting. *See, e.g., Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 768 (2019) ("In the Civil Rights Act of 1866, . . . Congress established a rule of equal treatment for newly freed slaves by giving them the 'same right' to make and enforce contracts and to buy and sell

---

(c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

property 'as is enjoyed by white citizens.' 42 U.S.C. §§ 1981(a), 1982."); *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474-75 (2006) ("§ 1981 . . . has a specific function:  It protects the equal right of '[a]ll persons within the jurisdiction of the United States' to 'make and enforce contracts' without respect to race. 42 U.S.C. § 1981(a)."); *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 304 (1994) ("§ 1981 covers all contracts."); *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609 (1987) ("the Court has construed [§ 1981] to forbid all racial discrimination in the making of private as well as public contracts."); and *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976) (noting, after an exhaustive review of its legislative history, that § 1981 "was meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race").

In the present case, the § 1981 claim fails because plaintiffs do not allege that defendants impaired any of their contractual relationships.  As the Supreme Court emphasized in *Domino's Pizza*,

> [a]ny claim brought under § 1981, therefore, *must initially identify an impaired "contractual relationship*," § 1981(b), under which the plaintiff has rights. . . . We have never retreated from what should be obvious from reading the text of the statute:  Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship.

546 U.S. at 476 (footnote omitted; emphasis added).  The first amended complaint does not allege this element of a § 1981 claim.  As plaintiffs make clear in explaining the basis of their § 1981 claim, they do not rely on any impaired contractual relationships, but argue instead that "Defendants directly interfered with the Plaintiffs' construction efforts, remediation efforts and

residence on the subject property." Pls.' Resp. to Def. Meyers' and Def. Roesner-Meyers' Mot.

to Dismiss at 4.  As no impairment of contract is alleged, the Court shall dismiss Count I.

***Count II:  42 U.S.C. § 1982***

In Count II, plaintiffs allege that defendants violated their rights under 42 U.S.C.

§ 1982.[2]  They allege:

> 384. Defendants, individually and in concert, denied each of the Plaintiffs and Foster Children of their right to use, reside and enjoy the benefits of the Property based on Defendants' racial discrimination in the following ways and through other actions described in detail above:

> a. Defendants have physically stalked and harassed the Plaintiffs by sitting in cars and/or standing on the public road watching Plaintiffs in their private home and on their private property.  This has lead to Defendants and third parties working in concert with the Defendants to actually trespass on the Property, whereby the Defendants and others sought to unlawfully inspect the premises and verbally harass the Plaintiffs, including the minor Children.  Further, one of the Defendants recently trespassed on the Property and delivered a message containing vulgar language on their copy of the Complaint served in this matter.

> b. Defendants, individually and in concert, harassed the Plaintiffs by referring to the Children and Foster Children with racial epithets, including words and phrases considered to be code for African Americans, including "Detroit" people, "blacks," residents of "juvenile jail," "slaves" and children who go "AWOL" or otherwise misbehave and require the assistance of increased police enforcement.

> c. Defendants, individually and in concert, also harassed the Plaintiffs by stalking the Children and Foster Children on the Property, petitioning the Township for 3 years to keep the Plaintiffs out of Horse County [sic], sending FOIA requests for the

---

[2] Section 1982 states:  "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

Children's confidential records, which are not subject to FOIA and by otherwise making the Plaintiffs feel unwelcomed.

d. Defendants further made public statements that they did not want the Foster Children in Horse Country due to their mental, emotional and/or physical disabilities, referring to them as "un fosterable," "unadoptable" and suffering from emotional and physical issues.

e. Defendants, individually and in concert, campaigned EGLE and OCHD, making false claims of "contaminants," "toxic waste" and child abuse for purposes of keeping the Plaintiffs and the Foster Children off the Property.

385. Defendants did not make these same allegations against David Fischer, a white male neighbor to HOP, whose property also had lead levels above the legal requirement and also constructed a private road on his property during the same time period that Plaintiff's private road request was approved by the Township.

386. Defendants were aware that Mr. Fischer was constructing the roadway on the Fischer Property, based on the photographs provided by KRM [Kallie Roesner-Meyers] and based on the communications with OTPC.

387. Defendants were further aware of the lead levels on the Fischer Property as they have been in possession of and have consistently relied on the 2004 ECI Report, evidencing the lead levels on the Fischer Property.

388. Defendants, individually and in concert, petitioned the Township with meritless claims of statutory and ordinance violations, for the purposes of keeping Plaintiffs out of Horse Country.

389. The clear and natural consequences of Defendants' actions was to infringe on Plaintiffs' and the Foster Children's enjoyment of the Property, which they held and received the benefits of residing.

390. Specifically, the Plaintiffs (especially the minor Children) fear that the Defendants will not stop stalking, harassing or otherwise harming the Plaintiffs, which could lead to physical violence or other displaces [sic] of aggression.

391. As a direct and proximate result of Defendants' actions as described in detail above, Plaintiffs have been deprived of their enjoyment of the Property, fearing for their health and safety in living in their own home.

392. Further, Plaintiffs and the Foster Children have suffered mental and emotional distress from Defendants' actions.

Am. Compl. ¶¶ 384-92.

Defendants argue that this claim fails because (1) the individual plaintiffs do not own the property (HOP does) and they therefore lack standing, and (2) the case authority regarding harassment by neighbors, as a category of interference with property rights, suggests that the harassment must be more severe than plaintiffs have alleged in order to state a § 1982 claim. Defendants cite a number of cases, including *Wells v. Rhodes*, 928 F. Supp. 2d 920 (S.D. Ohio 2013) (cross burning and written racial epithets); *Whisby-Myers v. Kiekenapp*, 293 F. Supp. 2d 845 (N.D. Ill. 2003) (flash-bang device and verbal racial epithets); *Byrd v. Brandeburg*, 922 F. Supp. 60 (N.D. Ohio 1996) (Molotov cocktail); *Cotton v. Duncan*, 1993 U.S. Dist. LEXIS 16161 (N.D. Ill. Nov. 15, 1993) (attempted cross burning), which, they argue, show that violence must be alleged to state a claim under § 1982.

The Court rejects defendants' argument regarding standing. Section 1982 speaks of the "right . . . to inherit, purchase, lease, sell, hold, and convey real and personal property." Regardless of which plaintiff owns the property at issue in this case, all of the plaintiffs "hold" it because they use the property and live there. This suffices to confer standing on all of the plaintiffs. *See United States v. Brown*, 49 F.3d 1162, 1167 (6th Cir. 1995) (stating that "non-owners of property who nevertheless have an interest in using or holding that property have a viable property interest protected under Section 1982").

The Court also rejects defendants' argument that the amended complaint in this matter fails to state a § 1982 claim because no violence is alleged. The cases defendants cite all stand for the proposition that § 1982 is violated when neighbors harass the occupants because of their race and thereby interfere with the occupants' use of their property. Neither these cases, nor any of which the Court is aware, require violence as an element of a § 1982 claim; violence suffices to make out such a claim, but it is not necessary. In *Wells*, the court found that the rights of plaintiffs, an African-American family, were violated under § 1982 when two local residents burned a 4' x 5' cross, on which they had written racial epithets, on plaintiffs' front lawn. Plaintiffs' home was not damaged, and plaintiffs were frightened but not physically harmed. The court found that "Defendants' discriminatory conduct infringed on Plaintiffs' rights under § 1982 to hold and use their property. . . . [I]ntimidating and threatening acts . . . deny a person the equal right to hold property as enjoyed by other citizens. This is the type of conduct § 1982 is meant to address." *Wells*, 928 F. Supp. 2d at 927.

In the present case, plaintiffs' allegations suffice to state a § 1982 claim. Plaintiffs allege that defendants harassed and intimidated them – by, for example, using racial epithets, making false reports to the police and various administrative agencies, stalking the Dunns' children, and trespassing on the property – because of plaintiffs' race, and that defendants have thereby interfered with plaintiffs' peaceful use and enjoyment of their property. Harassment and intimidation by such means may interfere with the use and enjoyment of property just as effectively as burning a cross on the property's front lawn. Plaintiffs' allegations suffice to state a claim under § 1982. The Court shall therefore deny defendants' motion to dismiss Count II.

*Count III:  42 U.S.C. § 1983*

In Count III, plaintiffs allege that defendant Kallie Roesner-Meyers ("KRM") abused her position as a member of the Oxford Township Planning Commission ("OTPC") and of the Zoning Board of Appeals ("ZBA") to violate their rights under § 1982 and that she thereby also violated their rights under 42 U.S.C. § 1983.[3]  Specifically, plaintiffs allege:

> 397. KRM was a member of the Township's Zoning Board of Appeals and Planning Commission from 1999 until December 2018.

> 398. KRM was acting under the color of the law when she interfered with Plaintiffs' construction, remediation, lot split, road installation and other actions between 2016 and 2018 as described in detail above.

> 399. KRM has a history of racial intimidation and using her position in the Township to carry out her discriminatory intent, as made evident by her Team 20 efforts with LR [Larry Roesner] and BM [Bruce Meyers].

> 400. Based on KRM's statements made online, at public meetings and at Legislature sessions, it is evident that KRM's goal was to keep African Americans out of Horse Country.  *See Exhibit 43.*

> 401. KRM did absolutely nothing to interfere with Mr. Fischer when he split the original lot into the Fischer Property and the subject Property.

> 402. KRM did not interfere with Mr. Fischer's actions when he

---

[3] Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

14

began construction on the Fischer Property – despite the lead levels on his lot.

403. KRM did not do anything to advocate for the remediation of the subject Property until HOP purchased the Property.

404. KRM, acting under the color of the law[,] used her powers to infringe upon Plaintiffs' Constitutional Rights and in violation of 42 U.S.C. § 1982.

405. KRM was motivated by racial discrimination in wanting to keep African Americans, such as the Children and Foster Children, out of Horse Country.

406. KRM, acting under the color of law as a member of the ZBA and OTPC, made unlawful and unethical inquiries to [sic] Plaintiffs' records with the OCE, as described in detail above.

407. KRM also petitioned the ZBA and OTPC to deny Plaintiffs based on their use of the Property, which was permitted under MCL 125.3206(1) and did not require a variance, as described in detail above.

408. KRM used and commanded her "scouting party" and/or the group known as the "Preservation of Hunt Country Neighbors," consisting of the Defendants and other third parties in Horse Country, to attend public hearings and to continue an email, phone and social media campaign for purposes of keeping Plaintiffs out of Horse Country.

409. KRM campaigned to amend the Township's Master Plan for Horse Country for the purposes of keeping Plaintiffs and the Foster Children out of Horse Country and stop Plaintiffs' lawful operations on the Property.

410. As a direct and proximate result of KRM's actions and interference as described in detail above, Plaintiffs' project on the Property was delayed for years and they incurred additional unnecessary costs in order to use, reside and maintain their Property.

411. Further, Plaintiffs and the Foster Children, have suffered mental and emotional distress from KRM's actions.

Am. Compl. ¶¶ 397-411 (italics in original).

Defendant Roesner-Meyers correctly argues that these allegations fail to state a claim against her under § 1983. "A plaintiff proceeding under § 1983 must establish that a person acting under color of state law deprived him of a right secured by the Constitution or by federal law." *Hoover v. Walsh*, 682 F.3d 481, 492 (6th Cir. 2012). "[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 50 (1988). Importantly, however, when a state actor is charged with a misuse of power, it is only the misuse of power "*possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law*" that constitutes state action. *United States v. Classic*, 313 U.S. 299, 326 (1941) (emphasis added).

In the present case, plaintiffs do not allege that Roesner-Meyers violated any of their federal rights while acting in her capacity as a township official. Some of the actions attributed to her were, as the amended complaint makes clear, taken in her capacity as a private citizen, and not by virtue of any authority she possessed as a member of the OTPC or the ZBA. Her alleged "statements made online, at public meetings and at Legislature sessions," Am. Compl. ¶ 400, plainly fall in this category, as do the allegations that she "used and commanded her 'scouting party and/or the group known as the 'Preservation of Hunt Country Neighbors''" to oppose plaintiffs' construction plans. *Id.* ¶ 408. Similarly, the allegation that Roesner-Meyers "campaigned to amend the Township's Master Plan," *id.* ¶ 409, is not action she was empowered to take by virtue of any official authority she possessed, as any township resident has the ability to engage in such a "campaign." Elsewhere plaintiffs allege that "Defendants,

especially KRM, have been observed stalking the Children and Foster Children by watching them from the perimeter of the Property – instilling fear in the Children and Foster Children for their health, safety and enjoyment of their own home," *id.* ¶ 63, but this, too, is private behavior, not state action.

Plaintiffs do allege that Roesner-Meyers took some action in her official capacity, but none that deprived them of a federal right. Plaintiffs' allegations that she, while "acting under the color of law as a member of the ZBA and OTPC, made unlawful and unethical inquiries to [sic] Plaintiffs' records with the OCE, as described in detail above," *id.* ¶ 406, does not allege the violation of a federal right. "Making inquiries" does not violate any federal right of which the Court is aware. And while plaintiffs allege that Roesner-Meyers "was acting under the color of the law when she interfered with Plaintiffs' construction, remediation, lot split, road installation and other actions between 2016 and 2018 as described in detail above," *id.* ¶ 398, the amended complaint fails to allege any specific, discriminatory action she took in her capacity as a township official. For example, plaintiffs allege that defendant Benson

> complained to KRM, as member of the OTPC, that the Township was not protecting the 'jewel' that is Horse Country and that '[t]his whole project [referring to HOP] is nothing but bad news for one of the few quiet and unspoiled neighborhoods left in Oxford . . . . This message from [Benson] was forwarded by KRM to the other members of the OTPC for purposes of interfering with and ultimately preventing HOP from operating on the subject Property.

*Id.* ¶¶ 86-87. But there is nothing improper about Roesner-Meyers forwarding a resident's message to the other OTPC members. The same may be said about the allegation that Roesner-Meyers, "'on behalf' of the OTPC and under the color of the law, called Brenda Firestone at the OCE requesting information regarding the proposed land division of the Property and the

permissibility of HOP to obtain approval to divide the Property into multiple parcels." *Id.* ¶ 132. Requesting information violates no one's rights.

Finally, plaintiffs allege that Roesner-Meyers " used her position on the OTPC and ZBA to interfere with HOP's ability to split the Property and construct a private road," *id.* ¶ 129, but they do not allege how she did so other than to send emails, give testimony, and post items on Facebook, none of which is state action.

The Court concludes that plaintiffs have failed to state a § 1983 claim against defendant Roesner-Meyers. The Court shall therefore dismiss Count III.

**Count IV: 42 U.S.C. § 1985(3)**

In Count IV, plaintiffs allege that "Defendants conspired to deprive Plaintiffs of their rights under the Constitution and in violation of 42 U.S.C. §§ 1981, 1982 and 1983 for purposes of keeping African Americans and/or disabled people out of Horse Country," *id.* ¶ 418, in violation of their rights under 42 U.S.C. § 1985(3).[4]

---

[4] Section 1985(3) states:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

18

This Court has summarized the elements of a cause of action under § 1985(3) as follows:

> In order to establish a violation of 42 U.S.C. § 1985(3), a plaintiff is required to plead and prove: (1) a conspiracy involving two or more persons; (2) for the purpose of depriving, directly or indirectly, a person or class or persons of the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) which causes injury to a person or property, or deprivation of any right or privilege of a citizen of the United States. *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994). Additionally, plaintiff must allege "the conspiracy was motivated by racial, or other class-based, invidiously discriminatory animus." *Bass v. Robinson*, 167 F.3d 1041, 1050 (6th Cir. 1999).

*Marks One Car Rental, Inc. v. Auto Club Grp. Ins. Co.*, 55 F. Supp. 3d 977, 989 (E.D. Mich. 2014).

Plaintiffs have stated a claim under this statute by alleging that defendants conspired (i.e., acted in concert), for racially discriminatory reasons, to deprive plaintiffs of their right to peacefully use their home and property. *See Wells*, 928 F. Supp. 2d at 930 (concluding "that § 1982 provides an adequate basis for a private conspiracy claim under § 1985(3)"). Defendants' motion to dismiss Count IV is therefore denied.

### Count V:  Fair Housing Act

In Count V, plaintiffs allege that defendants interfered with their rights under the FHA, in violation of 42 U.S.C. § 3617,[5] by "den[ying] Plaintiffs their right to use, reside [at] and

---

[5] Section 3617 states:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of

enjoy the benefits of the Property," Am. Compl. ¶ 432, and by causing "Plaintiffs' project on

the Property [to be] delayed for years" and causing plaintiffs to "incur[] additional unnecessary

costs in order to use, reside [at] and maintain their Property." *Id.* ¶ 435.

"To state a claim under § 3617, the plaintiff . . . must establish (1) that he

exercised or enjoyed a right guaranteed by §§ 3603-3606; (2) that the defendant's intentional

conduct constituted coercion, intimidation, threat, or interference; and (3) a causal connection

between his exercise or enjoyment of a right and the defendant's conduct." *Hood v. Midwest

Sav. Bank*, 95 F. App'x 768, 779 (6th Cir. 2004).   A plaintiff must also "demonstrate

'discriminatory animus' to prevail on an interference claim under the Act." *HDC, LLC v. City

of Ann Arbor*, 675 F.3d 608, 613 (6th Cir. 2012).   Courts have recognized that the right to use

and enjoy property is among those guaranteed under § 3604 and that a plaintiff who alleges a

racially motivated "hostile housing environment" may proceed under §§ 3604 and 3617.   *See,

e.g., Francis v. Kings Park Manor, Inc.*, 944 F.3d 370, 377 (2d Cir. 2019) (collecting cases),

*reh'g en banc granted*, 949 F.3d 67 (2d Cir. 2020).   Allegations that suffice to state a § 1982

claim may also suffice to state a claim under §§ 3604 and 3617.   *See Wells*, 928 F. Supp. 2d at

932 (noting that "the Sixth Circuit has suggested that FHA discrimination claims apply similar,

if not the same, standards to § 1982 claims").

Defendants argue, citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380

(1982), that plaintiffs' FHA claim is time-barred because such claims are subject to a 180-day

---

this title.

Section 3603 specifies the effective dates of the other statutes; § 3604 prohibits discrimination in
the sale or rental of housing; § 3605 prohibits discrimination in residential real estate-related
transactions; and § 3606 prohibits discrimination in the provision of brokerage services.

limitations period.  Defendants are mistaken.  In 1988, after *Havens* was decided, Congress amended the limitations period, and it is now two years.  *See* 42 U.S.C. § 3613(a)(1)(A). Defendants have not demonstrated that the discriminatory acts that are the subject of this lawsuit occurred more than two years before plaintiffs filed suit.  The Court shall therefore deny defendants' motion to dismiss Count V.

***Count VI:  Americans with Disabilities Act***

In Count VI, plaintiffs allege that defendants violated their rights under the ADA, 42 U.S.C. § 12101, *et seq*, and in particular § 12182(b)(1)(A),[6] by "interfer[ing] with the Plaintiffs' and Foster Children's opportunity to participate in HOP's foster care program, which

---

[6] Section 12182 states:

(a) General rule

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

(b) Construction

(1) General prohibition

(A) Activities

(i) Denial of participation

It shall be discriminatory to subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity. . . .

provides social services, such as counseling, therapy, group activities, individualized education programs ('IEP') and a foster home."  Am. Compl. ¶ 444.

Defendants argue that they cannot be held liable under this statute, which is directed to the owners, lessors, and  operators of public accommodations, because they do not own, lease, or operate HOP.  Among other cases, defendants cite *Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1015 (6th Cir. 1997), for its statement that this section of the ADA "mandates that the owners, lessors, and operators of public accommodations provide equal access to the disabled and non-disabled."  The statute plaintiffs rely on, § 12182(a), itself makes clear that it applies only to a "person who owns, leases (or leases to), or operates a place of public accommodation."

In response, plaintiffs concede that the section of the ADA on which they rely applies to owners, lessors, and operators of public accommodations, *see* Pls.' Resp. to Def. Blanock's Mot. to Dismiss at 15, but they assert that

> [i]n this case, the Defendants . . . face civil liability in their individual capacities because they acted in a discriminatory manner by interfering with HOP's  license to house and care for the Foster Children and ST who have qualified disabilities protected by the ADA. Specifically, the Defendants filed false and unsubstantiated complaints with the Michigan Attorney General's office, Michigan Department of Health and Human Services, Police Departments, Oxford Township and other governmental entities for the purposes of shutting down HOP and/or preventing the Plaintiffs from obtaining the license[s] necessary to operate HOP.

*Id.* at 16.

Plaintiffs cite no authority for the proposition that persons who are not owners, lessors, or operators of a public accommodation can be held liable under the ADA for interfering

22

with a disabled person's right of access to such an accommodation.  In the absence of any such authority, it appears that defendants cannot be held liable for their alleged interference with any of the minor plaintiffs' right to participate in the public accommodation of a CCI.  Therefore, the Court shall grant defendants' motion to dismiss Count VI.

### Counts VII-IX:  Defamation, Business Defamation, Libel and Slander

In Counts VII-IX, plaintiffs allege that defendants defamed them:

450. Defendants' accusations about the "contaminants," "toxic waste" and lead levels as of 2019 are false and/or grossly misrepresented.

451. Defendants' accusations that Plaintiffs "pack children" into an institution for purposes of "getting rich" is false.

452. Defendants' accusation that Plaintiffs bribed or otherwise coerced DHHS agents into granting the CCI license is false.

453. Defendants' accusation that Plaintiffs bribed or otherwise coerced employees or agents of the Township is false.

454. Defendants' accusations of child abuse are false.

455. Defendants' accusations that the Children and Foster Children are criminal, "AWOL," "unfosterable" or "unadoptable" is false.

456. Defendants' accusations that Plaintiffs committed fraud in operating the foster care home and/or converted charitable funds is false.

457. As described in detail above and supported by Exhibits 1 through 43, Defendants published the remarks to third parties with knowledge of the falsity of each of the above statements or in reckless disregard of their truth or falsity.

*   *   *

467. As described in detail above and supported by Exhibits 1 through 43, Defendants made . . . allegations, reports and

23

complaints against HOP that were knowingly false and/or without regard to the truth of the statements, including:

a. False allegations accusing JD and/or MD of sexual abuse, sexual harassment and concealment of sexual abuse and harassment,

b. False accusations and reporting about the lead levels on the Property,

c. HOP's intent to "pack" the Foster Children in the house in order to "get rich,"

d. Plaintiffs converted charitable funds and otherwise committed fraud in operating HOP,

e. HOP bribed and/or coerced governmental officials and agents in order to obtain permission to use the Property as a foster home, to obtain its CCI license, to approve the lot split, to obtain approval for the installation of the private road and

f. HOP's executives have abused the Children and/or Foster Children in their care.

468. Defendants negligently or with actual malice published false and defamatory statements regarding HOP to the public, EGLE, DHHS, OCHD, Township, OTPC, AG, Legislature and to law enforcement.

*   *   *

478. Defendants' accusations about JD and/or MD committing sexual abuse, sexual harassment and concealment of sexual abuse and harassment are false.

479. Defendants' accusations about the "contaminants," "toxic waste" and lead levels as of 2019 are false and/or grossly misrepresented.

480. Defendants' accusations that Plaintiffs "pack children" into an institution for purposes of "getting rich" is false.

481. Defendants' accusations that the Children and/or Foster Children were a danger to society, would increase police patrol

and are in a "work farm" or "prison" is false.

482. Defendants' accusation that Plaintiffs bribed or otherwise coerced DHHS agents into granting the CCI license is false.

483. Defendants' accusation that Plaintiffs bribed or otherwise coerced employees or agents of the Township is false.

484. Defendants' accusations of child abuse are false.

485. Defendants' accusations that the Children and Foster Children are criminal, "AWOL," "unfosterable" or "unadoptable" is false.

486. Defendants' accusations that Plaintiffs committed fraud in operating the foster care home and/or converted charitable funds is false.

Am. Compl. ¶¶ 450-57, 467-68, 478-86.

While these statements may well be defamatory, the problem with these allegations is that they group all of the defendants together and fail to allege which defendant made which statement(s) and when. Defendants are not responsible for each other's statements, so it is improper to make group allegations regarding the statements "defendants" made. Each defendant is entitled to know which statement(s) he/she made that plaintiffs allege to be defamatory, and it does not suffice for plaintiffs to refer defendants, and the Court, to a long list of video-recordings of defendants speaking (*see id.* Ex. 43, listing videos A through HH).

The Court shall grant defendants' motions to dismiss the defamation claims (Counts VII-IX) because plaintiffs have failed to allege them with sufficient particularity. If plaintiffs wish to pursue these claims, the Court shall permit plaintiffs to file an amended complaint, within fourteen days of the date of this opinion, that alleges specifically which defendant made which defamatory statement(s) (to be quoted verbatim) and when. Plaintiffs

25

must also keep in mind, as defendants point out, that defamation claims in Michigan are subject to a one-year limitations period, *see Mitan v. Campbell*, 706 N.W.2d 420, 422 (2005) (citing Mich. Comp. Laws § 600.5805(1), (9)), and therefore plaintiffs may not base any of their defamation claims on statements allegedly made more than one year before this action was commenced.

**Counts X and XI:  Intentional and Negligent Infliction of Emotional Distress**

In Counts X and XI, plaintiffs allege that defendants intentionally and negligently subjected them to emotional distress by

> a. Stalking and harassing the Children and Foster Children,
>
> b. Referring to the Children and Foster Children with racial epithets and slurs,
>
> c. Stating that the Children and Foster Children are on a "work farm" or "prison,"
>
> d. Falsely accusing the Children's and Foster Children's caretakers, JD and MD, of sexual abuse, sexual harassment and concealment of the same,
>
> e. Making knowingly false police reports about the Children and Foster Children,
>
> f. Making knowingly false child abuse reports and complaints,
>
> g. Making knowingly false contamination claims,
>
> h. Petitioning the Township for purposed [sic] of keeping Plaintiffs out of Horse Country and
>
> i. [Making] [v]erbal attacks in public and online regarding the Plaintiffs' character, skin color, lifestyle and status with the State of Michigan.

Am. Compl. ¶¶ 494, 500.

Defendants argue that (1) these torts are not recognized in Michigan; (2) if these torts are recognized, they are subject to a one-year limitations period and are therefore largely time-barred; (3) if these torts are recognized, then they are not properly pled; and (4) the allegations group all defendants together and fail to allege specifically what each defendant said or did that was extreme and outrageous.

Defendants are plainly incorrect as to their first and second arguments. The Michigan Court of Appeals has recognized the torts of intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED") for many years. *See Cotton v. Banks*, 872 N.W.2d 1, 15 (Mich. Ct. App. 2015) (citing case authority dating back to 1976 and noting that "Michigan courts have recognized that the common-law tort of intentional infliction of emotional distress vindicates a person's 'right to be free from serious, intentional and unprivileged invasions of mental and emotional tranquility'"); *Hayes v. Langford*, No. 280049, 2008 WL 5158896, at *3 (Mich. Ct. App. Dec. 9, 2008) (citing case authority dating back to 1986 and noting that "Michigan recognizes a cause of action of negligent infliction of emotional distress"). Further, the limitations period for both torts is three years, not one year. *See Lechner v. Peppler*, No. 337872, 2018 WL 2121483, at *3 (Mich. Ct. App. May 8, 2018) (IIED); *Bishop & Heintz, P.C. v. Finch*, No. 327400, 2016 WL 3749388, at *3 (Mich. Ct. App. July 12, 2016) (NIED).

As to whether the claims are sufficiently pled, the elements of an IIED claim are "(1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff." *Lucas v. Awaad*, 830 N.W.2d 141, 150 (Mich. Ct. App. 2013) (citations omitted). The elements of a NIED claim are

"(1) the injury threatened or inflicted on the third person is a serious one, of a nature to cause severe mental disturbance to the plaintiff, (2) the shock results in actual physical harm, (3) the plaintiff is a member of the third person's immediate family, and (4) the plaintiff is present at the time of the accident or suffers shock 'fairly contemporaneous' with the accident." *Taylor v. Kurapati*, 600 N.W.2d 670, 693 (Mich. Ct. App. 1999).

Plaintiff's NIED claim is not sufficiently pled, as this tort requires allegations of serious injury threatened or inflicted on a third person (who must be a member of plaintiff's immediate family) and actual physical harm to the witnessing plaintiff, and the amended complaint does not allege these elements. In the absence of these allegations, the NIED claim fails. *See Richard v. Meijer, Inc.*, No. 342766, 2019 WL 1780670, at *6 (Mich. Ct. App. Apr. 23, 2019); *Sykes v. Phoenix Promotions, LLC*, No. 338476, 2018 WL 5305232, at *6 (Mich. Ct. App. Oct. 25, 2018). Therefore, the Court shall dismiss Count XI.

As for plaintiffs' IIED claim, the amended complaint alleges the required elements but fails to allege what each defendant personally did that was extreme and outrageous. As with plaintiffs' defamation claims, the amended complaint groups defendants together and alleges what they said and did collectively, not what each defendant said and did individually. As with the defamation claims, the Court shall dismiss plaintiffs' IIED claim for this reason. If plaintiffs wish to pursue this claim, they must file an amended complaint within fourteen days of the date of this opinion and allege specifically what each defendant said or did, and when, in support of this claim. It is not sufficient for plaintiffs to point to a list of video-recordings or to make general allegations (e.g., "stalking," "harassing," "making false police reports") and expect defendants, and the Court, to guess as to the exact basis of this claim as to each

28

defendant.

**Count XII:  Invasion of Privacy (False Light)**

In Count XII, plaintiffs make the following allegations in support of their claim

that defendants violated their privacy:

506. The Children's and Foster Children's status as wards of the State of Michigan, school records, foster care records, family court records and mental/emotional/physical conditions are private.

507. The Children and Foster Children have the right to keep their status, records and conditions private.

508. Defendants sought to obtain these confidential records regarding status, condition, schooling, counseling and other private information of the Children and Foster Children.

509. Defendants continued to pursue such private information by FOIA requests and demands to DHHS, the schools, State of Michigan and other entities.

510. Defendants obtained some information regarding the Children and Foster Children's status, records and conditions and made such information public. *See Exhibit 43*.

511. Defendants, without permission or consent, revealed private, sensitive information about the Plaintiffs, including the minor Children and the Foster Children for purposes of harassing and embarrassing the Plaintiffs, Children and Foster Child[ren], including making representations about mental, emotional and physical disabilities.

512. Defendants further used this private, sensitive information to paint the Children and Foster Children in false light by accusing them of criminality, misbehaving, trouble makes and otherwise in a negative manner.

513. Defendants['] actions in intruding on the Children's and Foster Children's right to privacy was highly offensive to them and  would be highly offensive to a reasonable person.

> 514. The Children and Foster Children have suffered embarrassment, humiliation and mental pay [sic] as a result of Defendants' actions to invade their privacy.

Am. Compl. ¶¶ 506-14 (italics in original).

Defendants argue that this claim should be dismissed because plaintiffs do not allege an essential element, namely, that defendants broadcasted the information at issue to a large number of people. Defendants cite *Porter v. Royal Oak*, 542 N.W.2d 905, 909 (Mich. Ct. App. 1995), for its statement that a plaintiff asserting a false light invasion of privacy claim "must show that the defendant broadcast to the public in general, or to a large number of people, information that was unreasonable and highly objectionable by attributing to the plaintiff characteristics, conduct, or beliefs that were false and placed the plaintiff in a false position." *Accord Case v. Hunt*, No. 341645, 2019 WL 1780643, at *6 (Mich. Ct. App. Apr. 23, 2019) (information must be "broadcast[ed] to a large number of people or to the public at large").

This claim is not sufficiently pled because it does not allege how or when or how widely the confidential information was broadcast. It does not suffice for plaintiffs to allege that defendants "revealed" information. Am. Comp. ¶ 511. The Court shall therefore dismiss Count XII.

**Count XIII:  Abuse of Process**

In this count, plaintiffs allege that defendants abused process.[7] They allege:

---

[7] Confusingly, plaintiffs label this count "Violation of MCL § 600.2907 Abuse of Process." Am. Compl. at 107. Section 600.2907, however, concerns malicious prosecution, not abuse of process, and the two are not the same. *See Early Detection Ctr., P.C., v. New York Life Ins. Co.*, 403 N.W.2d 830, 834-35 (Mich. Ct. App. 1986) (discussing both torts). At page 20 of their response to the Meyers' motion to dismiss, plaintiffs indicate they intend under this count to assert a claim for abuse of process. The Court notes that a claim under § 600.2907 would fail because plaintiffs do not allege the first element of a malicious prosecution, namely, "[p]rior

516. Defendants abused the law enforcement, DHHS, EGLE, OCHD and AG investigatory processes by using each for the ulterior motive of keeping African Americans and disabled people out of Horse Country.

517. Defendants falsely made child abuse allegations, reports and complaints against HOP, JD and MD, which instigated an investigation into the Dunn household, put their CCI license on hold and triggered severe emotional and mental trauma to the Children (who suffer from abandonment and other mental issues arising from the adoption and foster care processes).

518. These false child abuse allegations further threatened removal of the Children and Foster Children from JD, MD and HOP.

519. Defendants falsely accused the Children and Foster Children of committing crimes, leading to a police investigation by the Metamora Police Department, Lapeer County Sheriff Department and/or the Oakland County Police Department.

520. Defendants falsely made accusations, reports and complaints to EGLE and OCHD regarding "contamination" and "toxic waste" on the Property, which instigated numerous investigations into the Property, additional inspections, superfluous and unnecessary remediation beyond the legal requirement and delays in obtaining NFA's, permits and certificates of occupancy.

521. Defendants also falsely accused HOP, JD and MD of fraud and conversion of charitable funds, which instigated an investigation into the Plaintiffs and the finances of HOP and required Plaintiffs to seek legal and accounting advice in order to respond to the allegations.

522. This use of each of these processes were not legitimate, regular or legal.

Am. Compl. ¶¶ 516-22.

Defendants argue that this claim should be dismissed because "the abuse of

_____

proceedings terminated in favor of the present plaintiff[s]." *Early Detection*, 403 N.W.2d at 834.

process lies for the improper use of process after it has been issued, not for maliciously causing it to issue," Def. Meyers' and Def. Roesner-Meyers' Mot. to Dismiss at 18 (quoting *Spear v. Pendill*, 130 N.W. 343, 344 (Mich. 1911)), and plaintiffs do not allege that defendants used process after it was issued or indeed that any process ever issued.

The Court agrees with defendants.  As the Michigan Court of Appeals has explained:

> In *Lawrence v. Burdi*, 314 Mich. App. 203, 211-212; 886 N.W.2d 748 (2016), this Court discussed abuse of process:
>
>> "Abuse of process is the wrongful use of the process of a court." *Spear v. Pendill*, 164 Mich. 620, 623; 130 N.W. 343 (1922). "This action for the abuse of process lies for the improper use of process after it has been issued, not for maliciously causing it to issue." *Id*. at 623 (quotation marks and citation omitted). "To recover upon a theory of abuse of process, a plaintiff must plead and prove (1) an ulterior purpose and (2) an act in the use of process which is improper in the regular prosecution of the proceeding." *Friedman v. Dozorc*, 412 Mich. 1, 30, 312 N.W.2d 585 (1981). Expanding on each of the elements, the *Friedman* Court went on to explain that the act must be something more than just the initiation of a lawsuit, and the ulterior purpose has to be something other than settling a suit. *Id*. at 31. Justice Cooley, in his treatise on torts, stated, "One way in which process is sometimes abuse[d], is by making use of it to accomplish not the ostensible purpose for which it is taken out, but some other purpose for which it is an illegitimate and unlawful means." Cooley, The Law of Torts or the Wrongs which Arise Independently of Contract (3d ed.), p. 356.
>>
>> "A meritorious claim of abuse of process contemplates a situation where the defendant has availed himself of a proper legal procedure for a purpose collateral to the intended use of that procedure, e.g., where the defendant utilizes discovery in a manner consistent with the rules of procedure, but for the improper purpose of imposing an added burden and expense on the opposing party in an effort to conclude the litigation on favorable terms."

> *Vallance v. Brewbaker*, 161 Mich. App. 642, 646; 411 N.W.2d 808
> (1987). Liability is imposed for the misuse of process, no matter
> whether properly obtained, for any purpose other than that which
> it was designed to accomplish. *Friedman*, 412 Mich. at 30, n. 18.

*2 Crooked Creek LLC v. Frye*, No. 341274, 2020 WL 1228656, at *14 (Mich. Ct. App. Mar. 12, 2020).

In the present case, this claim fails because plaintiffs do not allege that defendants abused *court process*, i.e., a criminal or civil lawsuit. Rather, plaintiffs allege that defendants made a number of false complaints (e.g., of child abuse and fraud by the Dunns, criminal activity by the Dunns' children and foster children, and toxic waste on the property) and thereby caused the police and various administrative agencies to investigate plaintiffs and their property. But as Michigan courts have held, the tort "lies for the improper use of process after it has been issued, not for maliciously causing it to issue," *Spear*, *supra*, and plaintiffs do not allege that process was ever issued. The only case cited by plaintiffs in an effort to avoid dismissal of this claim is *Bloch v. Bloch*, No. 307640, 2013 WL 951076 (Mich. Ct. App. Mar. 7, 2013), but *Bloch* involved malicious prosecution, not abuse of process, and it has no application in the present case. The Court shall dismiss Count XIII for the reason urged by defendants.

**Count XIV: Tortious Interference with Contractual Relationships**

In Count IV, labeled "tortious interference with contractual relationships," plaintiffs allege:

> 525. Plaintiff HOP has a contract with the State of Michigan
> through DHHS to house and care for children who are wards of the
> state.
>
> 526. Defendants, by their unwarranted, negligent and/or
> intentional and/or reckless accusations of child abuse, sexual
> abuse/harassment, "contaminants," "toxic waste," conversion,

fraud, bribery and other criminal actions, . . . interfered with Plaintiffs' contract with DHHS.

527. Due to Defendants bombarding DHHS with false allegations and complaints, the CCI license was delayed.

528. Further, DHHS had to conduct additional internal and external investigations to verify the veracity of Defendants' claims.

529. As a direct and proximate result of Defendants' actions, Plaintiffs[] incurred additional unnecessary costs in order to obtain its [sic] CCI license, continue its [sic] contract with DHHS and otherwise operate as a CCI on the Property.

Am. Compl. ¶¶ 525-29.

"[T]ortious interference with a contract or contractual relations is a cause of action distinct from tortious interference with a business relationship or expectancy. The elements of tortious interference with a contract are (1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 706 N.W.2d 843, 848-49 (Mich. Ct. App. 2005) (citations and footnote omitted). Defendants correctly note that this claim fails in the present case because plaintiffs do not allege that the State of Michigan breached its contract with HOP. Plaintiffs allege only that defendants caused the CCI license to be delayed. Absent an allegation that the contract was breached, no claim for tortious interference with contractual relations has been stated. The Court shall therefore dismiss Count XIV.

*Count XV: Civil Conspiracy*

Finally, in Count XV, plaintiffs allege that defendants engaged in a civil conspiracy. Plaintiffs allege:

531. Defendants acted in a concerted action to keep Plaintiffs out

34

of Horse Country.

532. As detailed above, Defendants initiated a campaign against the Plaintiffs by bombarding government entities and the public with false allegations, accusations and reports of child abuse, sexual abuse/harassment, contamination, illegal land use, bribery, conversion, greed, along with criminal and unethical activities, for the purposes of carrying out this conspiracy.

533. Defendants conspired to defame Plaintiffs, to invade Plaintiffs' privacy, to cause intentional infliction of emotion[al] distress, to cause negligent infliction of emotional distress, to abuse the processes of law enforcement, the Township, DHHS, EGLE, OCHD and AG and tortiously interfere with Plaintiffs' contractual relationships.

534. Plaintiffs have suffered actual damages as a result of Defendants['] civil conspiracy, including:

a. Delays in setting up the foster home, obtaining certificates of occupancy and obtaining their CCI license;

b. Paying unnecessary costs for removal of lead at a level that far exceeded the legal requirements;

c. Paying unnecessary costs for additional inspections to the Property based on false claims;

d. Being the subject of false child abuse claims and the subsequent investigation;

e. Targeted for harassment and invasion of privacy; and

f. Other damages outlined above.

Am. Compl. ¶¶ 531-34.

Defendants' only argument as to this claim is that "'[c]onspiracy' is not a cause of action but is rather a method to apportion liability among multiple defendants for underlying tortious actions. *See Roche v. Blair*, 305 Mich. 608, 613-614, 9 N.W.2d 861 (1943)." Defs. Meyers' and Roesner-Meyers' Mot. to Dismiss at 19-20. This is not an entirely correct

statement of the law.  In *Roche*, the Michigan Supreme Court stated that "[t]he cause of action

does not result from the conspiracy, but from the thing done and the damage flowing from it."

9 N.W.2d at 863 (quoting *Bush v. Sprague*, 16 N.W. 222, 225 (Mich. 1883)).  More recently, the

Michigan Court of Appeals has explained:

> "A civil conspiracy is a combination of two or more persons, by
> some concerted action, to accomplish a criminal or unlawful
> purpose, or to accomplish a lawful purpose by criminal or
> unlawful means." *Admiral Ins. Co. v. Columbia Cas. Ins. Co.*, 194
> Mich. App. 300, 313, 486 N.W.2d 351 (1992). . . . However, "a
> claim for civil conspiracy may not exist in the air; rather, it is
> necessary to prove a separate, actionable tort." *Early Detection
> Center, PC v. New York Life Ins. Co.*, 157 Mich. App. 618, 632,
> 403 N.W.2d 830 (1986).

*Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 670 N.W.2d 569, 580 (Mich.

Ct. App. 2003), *aff'd*, 693 N.W.2d 358 (Mich. 2005).  Further, a "defendant can also be held

liable for a tort committed by some other person under a civil conspiracy theory if the defendant

combined with another person or persons by some concerted action to accomplish a criminal or

unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Franks

v. Franks*, No. 343290, 2019 WL 4648446, at *16 (Mich. Ct. App. Sept. 24, 2019) (citation and

internal quotation marks omitted).

The Court shall dismiss this claim because the Court has dismissed all of the

"separate, actionable tort[s]" (defamation, IIED, NIED, invasion of privacy, abuse of process,

and tortious interference with contract) upon which it could be based.  However, as noted above,

the Court shall permit plaintiffs to file an amended complaint to more clearly allege the basis

for their defamation and IIED claims.  If they do so, then they may reassert their civil conspiracy

claim as well.

*Defendants' First Amendment Defense*

In addition to their other arguments, defendants contend that all of plaintiffs' claims should be dismissed because, as defendant Benson puts it, "[t]he entire case–all of it– is based on core political speech. None of it is actionable, and all claims are barred by the First Amendment." Def. Benson's Mot. to Dismiss at 1. Similarly, defendant Roesner argues that "Plaintiffs have filed this lawsuit solely to prevent the Defendants, including Larry Roesner, from exercising their rights to lawfully ask questions of and bring information involving the community to the attention of state and local authorities and boards." Def. Roesner's Mot. to Dismiss at 1.

Defendants are mistaken that plaintiffs' "entire case" is based on political speech. As the amended complaint makes clear, plaintiffs also base their case on allegations that defendants filed false child abuse reports with DHHS, stalked the minor plaintiffs and referred to them with racial epithets, made false reports about plaintiffs and their property to various administrative agencies, made false police reports regarding plaintiffs, accused the Dunns of being charlatans and of sexually abusing children, defamed HOP by characterizing it as a "juvenile prison," falsely reported the Dunns to the Michigan Attorney General's Office, and accused the Dunns of bribing or coercing DHHS agents and Oxford Township officials. Am. Compl. ¶¶ 4-6, 59, 90-91, 102, 106, 113, 117-18, 482-83. Plainly, the allegations in this case go far beyond defendants' expression of "core political speech."

To the extent plaintiffs' case is based on defendants' speech, it is too early to assess defendants' First Amendment argument. The Supreme Court has held that speech is protected (including from state-law tort claims) if it involves a matter of public concern and this,

37

in turn, "requires us to examine the content, form, and context of that speech, as revealed by the whole record." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (internal quotation marks and citations omitted). Further, "[i]n considering content, form, and context, . . . it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." *Id.* at 454. The present case is still at the pleading stage, and therefore the "content, form, and context" of the speech cannot yet be properly evaluated. Further, as noted above, plaintiffs must amend their complaint, if they choose to do so, to allege specifically which statements were made by which defendants and when. After plaintiffs have done so, and after the parties have engaged in sufficient discovery to properly develop the record, defendants will be free to raise, and the Court will be able to assess, their First Amendment defense. But at the current, early stage of this case, dismissal of the complaint on this basis would be inappropriate.

### *Motion to Strike*

Defendants Bruce Meyers, Kallie Roesner-Meyers, Larry Roesner, Paul Warfield, and Kathy Warfield also ask that the Court strike the amended complaint because it is argumentative, is not concise, and contains offensive and defamatory language.

Under Fed. R. Civ. P. 12(f), the Court "may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Rule 12(f) motions "are viewed with disfavor and are not frequently granted." *Operating Eng'rs Local 324 Health Care Plan v. G & W Constr. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015). Generally, the matter to be stricken must have "no possible relation to the controversy." *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953).

While the amended complaint could have been drafted more concisely, the Court is not persuaded that any portions of it should be stricken.  Defendants have not shown that the allegations they find objectionable bear no relation to the controversy.  Defendants' motions to strike are therefore denied.

For the reasons stated above,

IT IS ORDERED that defendants' motions to dismiss [docket entries 44, 46, 50, 51, and 61] are granted in part and denied in part as follows:  Counts I, III, and VI-VX are dismissed.  Only Counts II (§ 1982), IV (§ 1985(3)), and V (FHA) remain.

IT IS FURTHER ORDERED that if plaintiffs wish to pursue Counts VII-IX (defamation claims) and Count X (IIED), they must file an amended complaint within fourteen days of the date of this opinion, alleging specifically, as to the defamation claims, which defendants made which defamatory statements (to be recited verbatim) and when; and alleging specifically, as to the IIED claim, which defendants made which outrageous statements (to be recited verbatim) or committed which outrageous acts and when.

IT IS FURTHER ORDERED that defendants' motions to strike are denied.

s/Bernard A. Friedman
BERNARD A. FRIEDMAN
SENIOR UNITED STATES DISTRICT JUDGE

Dated:  May 5, 2020
           Detroit, Michigan

39